**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LIBERTY SURPLUS INSURANCE
CORPORATION,

     Plaintiff,

v.                                                    Case No.: 9:22-cv-80203-Middlebrooks

KAUFMAN LYNN CONSTRUCTION,
INC., and UNITED GLASS SYSTEMS
CORPORATION,

     Defendants.

_____

**DEFENDANT'S, KAUFMAN LYNN CONSTRUCTION, INC.,**
**ANSWER AND COUNTERCLAIM**

COMES NOW, Defendant, Kaufman Lynn Construction, Inc. ("Kaufman"), by and

through undersigned counsel, and hereby answers Plaintiff's, Liberty Surplus Insurance

Corporation's ("Liberty"), Complaint for Declaratory Relief ("Complaint"), as follows:

**JURISDICTION AND PARTIES**

1.      Admitted that Liberty brought an action pursuant to the authority cited in this
paragraph. Otherwise, denied.

2.      Admitted that Liberty seeks a declaration as stated in this paragraph.
Otherwise, denied.

3.      Without knowledge, therefore denied.

4.      Admitted.

5.      Without knowledge, therefore denied.

6.      Admitted.

7.      Admitted.

**THE FACTUAL ALLEGATIONS**
**The Project at the JM Family Deerfield Campus**

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Admitted that a redacted copy of Kaufman's Second Amended Complaint is attached as Exhibit 1.

13.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

14.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

15.     Exhibit 3 to Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

16.     The Subcontract Agreements speak for themselves. Otherwise, denied.

17.     The Subcontract Agreement speaks for itself. Otherwise, denied.

18.     The Subcontract Agreement speaks for itself. Otherwise, denied.

19.     The Subcontract Agreement speaks for itself. Otherwise, denied.

20.     The payment and performance bonds speak for themselves. Otherwise, denied.

**Kaufman Issued a Notice of Default on May 28, 2020; United Allegedly Never "Cured"**

21.     Exhibit 8 to Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

22.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

23.     The alleged letter speaks for itself. Otherwise, denied.

24.     The Certificates of Occupancy speak for themselves. Otherwise, denied.

25.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

26.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

27.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

28.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

29.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

30.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

31.     The Renewed Notice speaks for itself. Otherwise, denied.

32.     The Renewed Notice speaks for itself. Otherwise, denied.

33.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

34.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

35.     The Notice of Breach speaks for itself. Otherwise, denied.

36.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

37.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

38.     Paragraph 64 of Exhibit 1 is redacted, along with footnote 2 to paragraph 64. Kaufman's unredacted Second Amended Complaint speaks for itself. Otherwise, denied.

39.     The "Wrap-Up" policy speaks for itself. Otherwise, denied.

40.     The "Wrap-Up" policy speaks for itself. Otherwise, denied.

41.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

42.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

43.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

44.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

45.     Denied.

46.     Admitted that Kaufman requested an extension of the policy period. Otherwise, denied.

47.     Admitted.

**Kaufman's Suit Against United, its Subcontractors,
Design Professionals, and Surety**

48.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied including all footnotes.

49.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied.

50.     Kaufman's Second Amended Complaint speaks for itself. Otherwise, denied including all footnotes.

**The Liberty Policy**

51.     Without knowledge, therefore denied.

52.     Admitted.

53.     Without knowledge, therefore denied.

54.     The Policy speaks for itself. Otherwise, denied including all footnotes.

55.     The Policy speaks for itself. Otherwise denied.

56.     Admitted that a redacted copy of the Policy is attached as Exhibit 2.

57.     The Policy speaks for itself. Otherwise denied.

**COUNT I
Declaratory Judgment that the Course of Construction Exclusion Relieves Liberty
of the Duty to Defend or Indemnify United from the claims asserted by Kaufman
in the Underlying Action**

58.     Kaufman restates it answers to Paragraphs 1-57, above, as if fully set forth herein.

59.     The Policy speaks for itself. Otherwise denied.

60.     The Policy speaks for itself. Otherwise denied.

61.    The Policy speaks for itself. Otherwise denied.

62.    The term "events" is ambiguous and undefined. As such, Kaufman is without knowledge, therefore denied.

63.    The term "events" is ambiguous and undefined. As such, Kaufman is without knowledge, therefore denied.

64.    The term "events" is ambiguous and undefined. As such, Kaufman is without knowledge, therefore denied.

65.    The term "events" is ambiguous and undefined. As such, Kaufman is without knowledge, therefore denied.

66.    Denied.

67.    Denied.

68.    The Course of Construction Exclusion speaks for itself. Otherwise, denied.

69.    Admitted that Liberty seeks a declaration as stated in this paragraph. Otherwise, denied.

70.    Admitted.

## AFFIRMATIVE DEFENSES

The affirmative defenses asserted herein are based on Kaufman's knowledge, information, and belief at this time, and Kaufman specifically reserves the right to modify, amend, or supplement any affirmative defenses contained herein at any time. Kaufman reserves the right to assert additional defenses or modify those asserted herein as information is gathered through discovery and investigation and/or as ambiguities in Liberty's Complaint are clarified. In asserting these defenses, Kaufman does not assume the burden of proof and/or persuasion with respect to any matter as to which Liberty bears the burden of proof and/or persuasion.

Subject to the foregoing, Kaufman sets forth the following affirmative defenses in connection with Liberty's Complaint:

### First Affirmative Defense

Kaufman affirmatively alleges, without admitting liability, that Liberty is estopped in whole or in part from bringing the claims set forth in its Complaint.

### Second Affirmative Defense

Kaufman affirmatively alleges, without admitting liability, that Liberty bears the burden of proving the applicability of every exclusion it contends precludes coverage.

### Third Affirmative Defense

Kaufman affirmatively alleges, without admitting liability, that Liberty is guilty of unclean hands, which should bar its recovery in this action. Liberty's wrongful conduct, which includes, but is not limited to, incorrectly and ambiguously defining the Project in the Policy in a manner contrary to the description provided by Kaufman in its Wrap-Up Application for Insurance and failing to remove the Course of Construction Exclusion from the Policy despite requests for same, precludes Liberty from seeking relief and Liberty's claim should be dismissed.

### Fourth Affirmative Defense

Kaufman affirmatively alleges, without admitting liability, that Liberty's declaratory relief cause of action is barred because Liberty has an adequate remedy at law.

### Fifth Affirmative Defense

Kaufman hereby incorporates herein all affirmative defenses alleged or to be alleged by the other Defendant, United Glass Systems Corporation, as defenses to Liberty's claims, and to the extent applicable and available to Kaufman, incorporates those defenses herein.

## COUNTERCLAIM

Defendant/Counter-Plaintiff, Kaufman Lynn Construction, Inc. ("Kaufman"), by and through undersigned counsel, hereby sues Plaintiff/Cross-Defendant, Liberty Surplus Insurance Corporation ("Liberty"), and in support thereof states as follows:

## JURISDICTION AND PARTIES

1.      Liberty is a citizen of New Hampshire for purposes of determining diversity under 28 U.S.C. § 1332(c)(1). Liberty is a corporation organized and existing under the laws of the State of New Hampshire, with its principal place of business in Boston, Massachusetts.

2.      Kaufman is a citizen of Florida for purposes of determining diversity under 28 U.S.C. § 1332(c)(1). Kaufman is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Delray Beach, Florida.

3.      Jurisdiction is proper pursuant to 28 U.S.C. §§ 1332 and 1367 because there is complete diversity of citizenship between Liberty and the Defendants, and the amount in controversy exceeds $75,000.00, exclusive of costs.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### A.  The Insured Project

5.      Kaufman was hired by JM Family Enterprises, Inc. ("JM") to serve as the general contractor for the JM Family Deerfield Campus at 100 Jim Moran Blvd., Deerfield Beach, Florida ("Project").

6.      Kaufman and JM entered into a modified AIA Document A133-2009 Agreement ("Prime Contract"), which memorialized the parties' agreement and their respective rights, obligations, and duties.

7.      The Project consists of two office buildings (Buildings A and B) connected by a dining hall and common area space (Building D) (collectively, "Phase 1").

8.      The Project further consists of a third building (Building C), which is part of an independent phase, constructed separate and apart from the other structures and is not the subject of the Loss, further defined *infra*. ("Phase 2").

**B.  The Liberty Project-Specific Commercial General Liability Policy**

   **i.  Liberty Fully Evaluates the Project and Agrees to Provide Completed Operations Coverage for Each Phase.**

9.      Kaufman sought to place general liability insurance for Kaufman, JM, and subcontractors for the Project, pursuant to a Contractor Controlled Insurance Program ("CCIP" or "Wrap") with Liberty.

10.     Liberty engaged in a careful underwriting process designed to comprehensively assess the nature of the Project and associated risk and place an insurance program consistent with that risk and Kaufman's needs.

11.     At all relevant times, Liberty understood that the Project was comprised of two (2) separate and distinct phases.

12.     At all relevant times, Liberty understood that construction on Phase 1 would be completed before construction of Phase 2 began.

13.     At all relevant times, Liberty understood that, once principal construction on Phase 1 had concluded, JM would immediately take possession of Phase 1, putting it to its intended use as JM's headquarters and signifying substantial completion of Phase 1.

14.    At all relevant times, both Liberty and Kaufman understood that Kaufman purchased an insurance policy to cover the Project, in its entirety, throughout the construction of both Phases, and for coverage to respond individually and appropriately based on the unique completion progress of each.

15.    This understanding was expressly understood, as reflected, for example, in Kaufman's Wrap-Up Application for Insurance ("Application"), wherein Kaufman described the Project in two Phases, as follows:

> Phase 1:  2 x 4-story steel and concrete office buildings (57k sq ft), a 2-story dining hall (27k sq ft), central energy plant (power, chillers, cooling tower, fire pump, emergency generator) (6k sq ft), 6-story precast parking garage (5 levels of parking, roof lid with solar panels) (306k sq ft).

> Phase 2: Demolish 5 existing buildings, 4-story steel and concrete office building (28k sq ft), 2-story training and conference center (35k sq ft), sports and recreation building (gym, basketball court, locker rooms, showers) (25k sq ft), amphitheater structure, hardscaping, landscaping, water features (fountains, reflecting pools).

A copy of Kaufman's Application is attached hereto as **Exhibit A**.

16.    Consistent with the Application and Liberty's due diligence, Liberty agreed to provide a policy to cover completed operations coverage as each Phase was put to its intended use.

### ii.    The Policy Provides Coverage for each Phase as it is Put to its Intended Use.

17.    Based on Kaufman's Application and the Underwriting negotiations, Liberty issued the CCIP Policy (policy no. 1000298109-01) ("the Policy") to Kaufman to provide coverage for the Project. A redacted copy of the Policy is attached as Exhibit 2 to Liberty's Complaint at D.E. 1.

18.     The Policy has a policy period of September 10, 2018 through December

31, 2021, and policy limits of $2,000,000 per occurrence and $4,000,000 in the aggregate.

19.     The Insuring Agreement provides as follows:

> We will pay those sums that the insured becomes legally
> obligated to pay as damages because of . . . "property damage"
> to which this insurance applies. We will have the right and duty
> to defend the insured against any "suit" seeking those damages.

20.     In Endorsement No. 26, Liberty merged the information from Kaufman's

Application to describe the Project and its two phases as follows:

> Demolition of (5) five existing buildings and New, Ground-Up
> Construction of (2) two (4) four-story steel SE concrete office
> buildings, (1) one (2) two-story dining hall, a 6k square foot,
> central energy plant, and a (6) six-story precast parking garage,
> as well as any operations within 1,000 feet of the designated
> project that are necessary and incidental thereto.

21.     The Project description contained in Endorsement No. 26 to the Policy was

altered – without Kaufman's knowledge or approval - from the Project description

provided by Kaufman in its Application.

22.     Regarding coverage for the individual phases once completed, the Policy

contains the following relevant provisions: (1) the products-completed operations hazard

("PCOH"); and (2) the Repair Work Endorsement.

23.     The Policy defines the term "complete" by the PCOH, which provides that

work is deemed "completed" when, *inter alia*, "that part of the work done at a job site has

been put to its intended use by any person or organization other than another contractor

or subcontractor working on the same project." Further, "[w]ork that may need service,

maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."[1]

24.     Similarly, the Repair Work Endorsement covers bodily injury and property damage arising out of repair work performed by the Named Insured. This coverage extension is triggered when "the Designated Project **or any part thereof** has been put to its intended use or is occupied **in whole or in part** by any person or organization other than another contractor or subcontractor working on the same project."

**C.  Liberty's Underwriting Team Actively Monitors the Construction Progress.**

25.     Phase 1 construction proceeded in due course.

26.     During construction of Phase 1, Liberty was routinely updated on its progress, confirming its understanding of the phased approach, and that completion of Phase 1 would be achieved with JM taking possession.

27.     For example, on February 26, 2019, Liberty's underwriting team responsible for evaluating the project and representing Liberty's position on the coverage placed for the Project, Britt Seller as underwriter and Casey Hartley as underwriting manager, attended a detailed, multi-hour walking tour of the Project.

28.     During the tour, Liberty observed, firsthand, the progress of the two-phased nature of the Project, with Phase 1 underway.

29.     During the tour, Liberty inquired, and had the opportunity to inquire, about the progress at the Project, generally, and Phase 1, specifically. All inquiries were addressed.

---

[1] See Policy, Section V—Definitions, No. 16.

### D. **Phase 1 Completes and is put to its Intended Use.**

30. Section 9.8.1 of the Prime Contract defines "Substantial Completion", as follows:

> "Substantial Completion" is the stage in the progress of the Work (or applicable Phase thereof) when: (a) the Work is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use; (b) all Work, other than incidental, corrective or punch-list work which has no material effect upon the utilization of function of the Project, is completed; (c) all systems and parts are functional; (d) all temporary utilities have been disconnected if requested by Owner and all permanent utilities are connected and operating normally; (e) all required inspections have been passed and all governmental approvals and occupancy permits have been issued including, but not limited to, a temporary certificate of occupancy or equivalent; (f) normal pedestrian traffic routes to the Project are not obstructed or hindered by Contractor's operations; and (g) Contractor has provided the Owner with specification sand operation maintenance manuals for all equipment.

31. On July 10, 2020, Temporary Certificates of Occupancy were issued for Phase 1, which therefore achieved substantial completion, within the meaning of the Prime Contract.

32. On July 10, 2020, JM immediately began the process of taking possession of the buildings in Phase 1 and began putting them to their intended use – as JM's company headquarters.

33. Three days later, on July 13, 2020, JM and Kaufman agreed that Kaufman achieved Substantial Completion, as defined in the Prime Contract.

34. On August 25, 2020, the Project Architect executed a Certificate of Substantial Completion certifying July 10, 2020 as the Substantial Completion date for Phase 1, in accordance with the Prime Contract

35.    As a result of the Substantial Completion of Phase 1 and JM's possession of same, Kaufman conducted approximately sixteen (16) training sessions with JM personnel, demonstrating to JM how to operate the multitude of building components, including, without limitation:

a.  BDA

b.  Booster pump

c.  Chiller plant

d.  Dining lighting controls

e.  Elevators

f.   Fire alarms

g.  Fire suppression

h.  Generator

i.   Hoover pumps

j.   Kitchen administration

k.  MDF power supply

l.   Mechanical systems

m. Office lighting

n.  Overhead door operations

o.  Sprinkler systems

p.  Smart window operations

36.    Within the thirty-day period following Substantial Completion of Phase 1 of the Project, JM was fully operating the Phase 1 buildings as its new company headquarters.  To wit:

a.    JM had:

    i.    Exclusive possession of the premises (Kaufman no longer had unrestricted access);

    ii.    Full operational control;

    iii.    Dedicated security protocols and staff (to which Kaufman was required to submit should it need access); and

    iv.    The buildings equipped with all necessary infrastructure – information technology, furnishings, workstations, supplies.

b.    The Phase 1 buildings served as the nerve center for JM's operations, where the Board of Directors would routinely meet; and

c.    Staff of all tiers used the facility in all manners consistent with the ordinary course of operations and daily activities – work, dining, personal facilities – and tours commenced for its dealers, wholesalers, and stakeholders.

### E.    Phase 1 is Damaged By Tropical Storm Eta

37.    On or about November 8, 2020, Tropical Storm Eta struck the area with thirteen (13) inches of rainfall, and windspeeds ranging, at times, between sixty (60) and seventy (70) miles per hour.

38.    Tropical Storm Eta caused physical injury to the completed Phase 1 buildings.

39.    Specifically, the buildings sustained significant water intrusion through the curtainwall and window wall systems at over fifty (50) locations. The water intrusion damaged the flooring, drywall, interior paint, paint, ceiling tiles, electrical wiring, furniture, and office supplies, among other elements (collectively, the "Loss").

40.     The cost to repair and remediate the damage is estimated to total no less than $3,574,717.24, which is within the Policy's limits

41.     Within days of Eta subsiding, Kaufman identified the damage it caused to Phase 1, and immediately hired a water damage mitigation consultant to assess the damage.

42.     On or about November 11, 2020, JM and Kaufman held a meeting wherein JM formally put Kaufman on notice of its position that Kaufman was liable for the damages resulting from Eta and demanded that Kaufman remedy them ("Covered Claim").

43.     Thereafter, Kaufman pursued various subcontractors from the Project whose work contributed to the property damage, including United Glass Systems Corporation ("UGS").  Eventually Kaufman filed a lawsuit against those entities.

**F.    Liberty Agrees Phase 1 is Complete and Adjusts the Covered Claim.**

44.      On or about November 16, 2020 Kaufman put Liberty on notice of the Covered Claim for Eta damages and timely tendered its demand for defense and indemnity.

45.     On November 20, 2020, Liberty acknowledged receipt of the Covered Claim and, on information and belief, commenced its analysis and adjustment of same.

46.     In the course of the claim adjustment, on December 17, 2020, Liberty confirmed its agreement with Kaufman that Phase 1 was complete, via electronic mail from its claim adjuster, Lorna Dorne-Smith.

47.     In connection with its adjustment of the Covered Claim, Liberty retained a law firm on Kaufman's behalf, in the course of adjusting the claim, to provide a legal analysis regarding Kaufman's potential exposure for the Loss.

48.    Liberty concluded that the damages were accurate and supported by the evidence.

49.    Liberty set reserves for the Loss sufficient to pay it in total.

**G.  Liberty Manufactures a Defense to Coverage**

50.    On or about April 8, 2021, Liberty issued a reservation of rights letter ("ROR") to Kaufman contending, for the first time, that the  Damage to the Project During the Course of Construction Exclusion in the Policy ("COC Exclusion") may "limit" or preclude coverage, arguing that *none* of the work could be "complete" until *all* Phases were complete; therefore, because Phase 2, which had not yet begun, was incomplete, the exclusion should apply.  A copy of the ROR is attached hereto as **Exhibit B**.

51.    Specifically, the COC Exclusion provides:

   This insurance does not apply to:

   1. Any "property damage" at or to any project insured under this policy during the course of construction until the project is completed.

52.    Liberty's position was contrary to the plain language of the Policy, as well as the undisputed underwriting history, Liberty's ongoing adjustment of the Loss, communications from Loran Dorne-Smith, and the parties' mutual understanding as to the Project and the coverage provided under the Policy.

53.    Kaufman, through counsel, wrote to Liberty and requested that it reconsider its ROR based upon the fact that: (1) Phase 1 of the Project was complete at the time of the loss, and thus the COC Exclusion did not apply; and (2) Liberty's application of the Policy language is inconsistent with the applicable law.

54.    Specifically, in relying on the COC Exclusion in this manner, Liberty ignored its own underwriting of the Project, which demonstrates its awareness that the Project

constituted two Phases and Liberty was keenly aware of the circumstances that would render Phase 1 complete.

55.    By misstating the parameters of the Project, despite Liberty's and Kaufman's mutual understanding of same, Liberty created an ambiguity in the language of the Policy.

### H.   Liberty Denies Coverage on the Eve of Mediation

56.    Kaufman, the subcontractors, and Liberty scheduled mediation for November 17, 2021.

57.    Contemporaneously, Liberty continued its adjustment and analysis of the Loss and concluded that Kaufman was legally liable, per the terms of the Policy.

58.    On information and belief, in reaction to this conclusion, and despite the long history of its understanding of the Project and the Loss, Liberty decided to deny coverage.

59.    On the eve of mediation, without warning and in contravention of its actions to that point - namely, assigning two desk adjusters, one field adjuster, and the conclusion of its own liability analysis - Liberty sent a letter advising Kaufman that it was closing its file.

60.    At mediation and continuing to date, Liberty failed and/or refused to resolve Kaufman's or the subcontractors' legal liability for the Loss despite its own independent conclusion acknowledging such liability and having been afforded an opportunity to do so within Policy limits.

61.    At or around the same time that Liberty refused to pay the Loss during mediation, and in direct contravention of its purported bases for doing so, Liberty

underwriters separately confirmed to Kaufman representatives that the Policy provides completed operation coverage to individual buildings as they are put to use.

**I.    Liberty Files Suit; Further Changes its Tactics to Avoid Payment**

62.    Thereafter, Liberty filed the instant lawsuit.

63.    In the instant lawsuit, Liberty abandons its first manufactured argument that Phase 2 must be complete and, for the first time, takes the position that Phase 1, in and of itself, was not complete at the time of the Loss.

64.    Liberty's assertion that Phase 1 was not complete at the time of the Loss blatantly ignores its own knowledge from the inception of the CCIP, and the evidence in its possession to demonstrate that the keys to Phase 1 had – literally and figuratively – been handed over to JM, as well as the limited scope of the claim for Eta damages and the timeline associated with same.

65.    Moreover, in relying on the COC Exclusion to avoid its obligations under the Policy, Liberty fails to acknowledge that the COC Exclusion does not contain a separate definition of the term "completed."

66.    The Policy defines the term "completed" as when, inter alia, "that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."

67.    Further, the Policy defines "completed" in relevant part, to include "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

68.    Phase 1 of the Project satisfied both definitions at the time of the Loss.

69.     Despite the above, Liberty has failed to comply with the terms of the Policy purchased by Kaufman.

## Count I
## Declaratory Judgment

70.     Kaufman incorporates the allegations contained in paragraphs 1-69, above, as if fully set forth herein.

71.     This is an action for declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, *et seq.*

72.     Kaufman seeks a declaration that the Policy provides coverage for the property damage to the Project and Liberty has a duty to defend or indemnify the Defendants as the Project was substantially completed at the time the property damage occurred.

73.     However, in its Complaint, Liberty seeks a declaration that the COC Exclusion extinguishes Liberty's duty to defend or indemnify any party from the claims asserted in the Underlying Action.[2]

74.     As such, the parties have a real, justiciable controversy between them and have an actual and practical need for this Court to adjudicate their rights as set forth above regarding Liberty's obligations under the Policy to pay Kaufman's losses arising from damages to the Project.

75.     Kaufman has a bona fide, actual, present, and practical need for a declaration of its rights.

76.     The declaration concerns a present, ascertained, or ascertainable state of facts or a present controversy as to a state of facts.

---

[2] See Liberty's Complaint at ¶69.

77.    An immunity, power, privilege or right of Kaufman is dependent upon the facts or the law applicable to the facts.

78.    Liberty has expressed an actual, present, adverse, and antagonistic interest in the subject matter, either in fact or law.

79.    The antagonistic and adverse interests of Liberty and Kaufman are before the Court. The issues sought to be adjudicated are not merely theoretical, and Kaufman is not seeking an advisory opinion of the Court.

80.    A determination as to the scope and amount of coverage afforded under the Policy for the damages to the Project has not been resolved between Kaufman and Liberty.

81.    A declaratory judgment is necessary and appropriate to determine the rights and duties of Kaufman and Liberty pursuant to the Policy.

82.    Kaufman is in doubt about its rights under the Policy and seeks a declaration as to the scope of coverage under the Policy.

83.    Kaufman is entitled to obtain a declaration regarding its rights, status and other equitable and legal relations and interests arising under the Policy.

84.    Accordingly, Kaufman is entitled to declaratory relief as set forth below.

85.    Kaufman has retained the law firm of Saxe, Doernberger, & Vita, P.C., Inc. ("SDV") to represent it in this action and has become obligated to pay SDV a reasonable sum for attorney's fees, costs, and suit monies in exchange for such representation.

WHEREFORE, Kaufman respectfully requests that this Court enter a judgment against Liberty declaring:

A.  This Court has jurisdiction over the parties and subject matter;

B. Kaufman is entitled to recover its total losses under the Policy as set forth in its Crossclaim;

C. Liberty must indemnify Kaufman for the full amount of its losses sustained as a result of property damage to the Project;

D. Liberty is required to immediately indemnify Kaufman and make payment to Kaufman for the full amount of its losses or policy limits, whichever is greater; and

E. Such other and further relief in Kaufman's favor as the Court deems just and proper under the circumstances.

### Count II
### Breach of Contract

87.    Kaufman incorporates the allegations contained in paragraphs 1-69, above, as if fully set forth herein.

88.    This is an action for Breach of Contract.

89.    Kaufman and Liberty entered into a valid, binding, and enforceable contract, i.e., the Policy.

90.    The Policy is ambiguous on its face because it describes the Project in a manner contrary to the description in Kaufman's Wrap-Up Application for Insurance.

91.    However, the Insuring Agreement provides coverage for "sums that the insured becomes legally obligated to pay as damages because of 'property damage.'"

92.    On or about November 11, 2020, JM made a claim and/or demand against Kaufman asserting that it is legally obligated to pay sums to Kaufman because of "property damage" to the Project.

93.    Thereafter, on or about November 16, 2020 Kaufman tendered to Liberty for defense and indemnity ("Tender").

94.    Kaufman also made a claim and/or demand against UGS and others asserting that they are legally obligated to pay sums to Kaufman because of "property damage" to the Project.

95.    Liberty rejected Kaufman's Tender on November 16, 2021, shortly before mediation.

96.    Based on the Policy language, the entirety of the Loss is covered.

97.    At all relevant times, the Policy was in full force and effect.

98.    Kaufman fulfilled all of its conditions and obligations under the Policy.

99.    On information and belief, the insured subcontractors have fulfilled all conditions and obligations under the Policy.

100.    The Project was Substantially Completed, as defined by the Prime Contract, at the time it sustained damages. As such, Liberty has a duty to defend or indemnify the Defendants.

101.    Despite demand, Liberty has failed, refused, and/or neglected to pay the full amount of Kaufman's claim for the Loss, in breach of its contractual obligations owed to Kaufman under the Policy.

102.    Liberty's failure to provide coverage, provide Kaufman with defense, and/or make proper payments for the damage is a breach of the contract for insurance between Kaufman and Liberty.

103.    As a direct and proximate result of Liberty's breach of contract, Kaufman has suffered, and will continue to suffer, damages resulting from the Liberty's failure to

provide coverage and/or make complete payments for the Loss, as provided for in the Policy.

104.    All conditions precedent to obtaining payment of said benefits under the Policy have been complied with, met, or otherwise waived.

105.    Kaufman has retained the law firm of Saxe Doernberger & Vita, P.C. ("SDV") to represent it in this action and has become obligated to pay SDV a reasonable sum for attorney's fees, costs, and suit monies in exchange for such representation.

WHEREFORE, Kaufman respectfully requests that this Court enter a judgment against the Liberty, finding:

A.  This Court has jurisdiction over the parties and subject matter;

B.  Liberty breached the contract between the Liberty and Kaufman;

C.  Liberty failed to provide payment to Kaufman for coverage under the Policy;

D.  Liberty is required to immediately indemnify Kaufman and make payment to Kaufman for the full amount of its losses or policy limits, whichever is greater;

E.  Kaufman is awarded attorneys' fees and costs; and

F.  Such other and further relief in Kaufman's favor as the Court deems just and proper under the circumstances.

## Count III
## Reformation Based on Mutual Mistake

100.    Kaufman incorporates the allegations contained in paragraphs 1-69, above, as if fully set forth herein.

101.    This is an action for reformation based on mutual mistake.

102.    Prior to the placement of the Policy, both Liberty and Kaufman understood and agreed the Project would be comprised of two (2) phases.

103.   Liberty's and Kaufman's mutual understanding and agreement was expressly reflected in Kaufman's Application for Insurance wherein Kaufman specified the Project description, as follows:

> Phase 1:  2 x 4-story steel and concrete office buildings (57k sq ft), a 2-story dining hall (27k sq ft), central energy plant (power, chillers, cooling tower, fire pump, emergency generator) (6k sq ft), 6-story precast parking garage (5 levels of parking, roof lid with solar panels) (306k sq ft).

> Phase 2: Demolish 5 existing buildings, 4-story steel and concrete office building (28k sq ft), 2-story training and conference center (35k sq ft), sports and recreation building (gym, basketball court, locker rooms, showers) (25k sq ft), amphitheater structure, hardscaping, landscaping, water features (fountains, reflecting pools).

104.   However, contrary to Liberty's and Kaufman's mutual understanding and agreement of the Project's parameters, Endorsement No. 26 to the Policy inaccurately describes the Project as follows:

> Demolition of (5) five existing buildings and New, Ground-Up Construction of (2) two (4) four-story steel SE concrete office buildings, (1) one (2) two-story dining hall, a 6k square foot, central energy plant, and a (6) six-story precast parking garage, as well as any operations within 1,000 feet of the designated project that are necessary and incidental thereto.

105.   Thus, Endorsement No. 26 inadvertently mischaracterizes the Project as only consisting of one (1) phase, instead of two (2).

106.   Liberty's unilateral change of the Project description renders the Policy language ambiguous, at best.

107.   As demonstrated by Liberty's coverage position and the instant lawsuit, the parties' respective obligations under the Policy could be affected due to Endorsement No. 26's mischaracterization of the Project's parameters.

108.    Namely, the application of the COC Exclusion based on the Project description may serve to improperly remove coverage for the Loss.

109.    It is equitable for this Court to reform the Project description language in Endorsement No. 26 such that it mirrors the description agreed to by the parties in Application.

110.    This reformation will result in Endorsement No. 26 accurately reflecting the parties' agreement and intent as to the Project's parameters.

WHEREFORE, Kaufman respectfully request that this Court enter a judgment against the Liberty, finding:

A. Endorsement No. 26, as drafted, does not reflect the parties' true intent and agreement with respect to the Project's description;

B. Due to the parties' mutual mistake, it is just and equitable to reform Endorsement No. 26 such that the Project description reads as follows:

> Phase 1: 2 x 4-story steel and concrete office buildings (57k sq ft), a 2-story dining hall (27k sq ft), central energy plant (power, chillers, cooling tower, fire pump, emergency generator) (6k sq ft), 6-story precast parking garage (5 levels of parking, roof lid with solar panels) (306k sq ft).

> Phase 2: Demolish 5 existing buildings, 4-story steel and concrete office building (28k sq ft), 2-story training and conference center (35k sq ft), sports and recreation building (gym, basketball court, locker rooms, showers) (25k sq ft), amphitheater structure, hardscaping, landscaping, water features (fountains, reflecting pools).

C. Such other and further relief in Kaufman's favor as the Court deems just and proper under the circumstances.

## Jury Demand

Kaufman demands trial by jury on all issues so triable.

Respectfully submitted on this 4th day of April, 2022.

SAXE, DOERNBERGER & VITA, P.C.

By: /s/Gregory D. Podolak
**Gregory D. Podolak**
Florida Bar No. 122087
999 Vanderbilt Beach Rd, Suite 603
Naples, FL 34108
Phone: (239) 316-7244
Primary email: gpodolak@sdvlaw.com
Secondary email: charper@sdvlaw.com

**Stacy M. Manobianca**
Pending *Pro Hac Vice* Admission
New Jersey Bar No.: 028402004
233 Mount Airy Road
Basking Ridge, NJ 07920
Primary: smanobiana@sdvlaw.com

**Leena Phaguda**
Florida Bar No. 117893
35 Nutmeg Dr., Suite 140
Trumbull, CT 06611
Phone: (203) 287-2100
Primary email: lphaguda@sdvlaw.com
*Attorneys for Kaufman Lynn Construction, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of April, 2022, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF filing system and thereby served on counsel of record.

/s/Gregory D. Podolak
**Gregory D. Podolak**